# IN THE COURT OF APPEALS OF IOWA

No. 23-0618
Filed July 13, 2023

**IN THE INTEREST OF M.M., J.M., and P.F.,**
**Minor Children,**

**M.M., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Webster County, Joseph L. Tofilon,
District Associate Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Alesha M. Sigmeth Roberts of Sigmeth Roberts Law, PLC, Clarion, for
appellant mother.

Brenna Bird, Attorney General, and Mary A. Triick (until withdrawal) and
Mackenzie Moran, Assistant Attorneys General, for appellee State.

Gregory H. Stoebe, Humboldt, attorney and guardian ad litem for minor
children.

Considered by Schumacher, P.J., and Chicchelly and Buller, JJ.

**BULLER, Judge.**

The mother appeals the termination of her parental rights to her three children. She argues she should receive a second six-month extension for reunification, termination is not in the best interests of the children, a permissive exception applies to preclude termination, and the State failed to make reasonable efforts for reunification. The record details the mother's ongoing issues with mental health, substance abuse, and parenting deficits, as well as her persistent refusal to engage in services. We affirm the termination of parental rights.

## I.     Background Facts and Proceedings

This appeal concerns termination of the mother's parental rights to M.M. (born 2017), J.M. (born 2019), and P.F. (born 2021). The family came to the attention of the Iowa Department of Health and Human Services (HHS) in June 2021, when the mother hit the father of one child with her car and that father then pulled the mother out of the car and physically assaulted her. Throughout the assaults, the children were in the car and were not strapped in properly. Both parents were arrested, and the children were removed from the mother's custody and adjudicated as children in need of assistance (CINA) in September 2021. The children have not returned to the mother's custody since then.

Concerns about domestic violence persisted after removal. In August 2021, the mother reported to the local hospital's emergency department with bruising on her face, but she claimed the injuries were from a bar fight. HHS believed otherwise and thought the mother was hiding the abuser in her basement, despite a no-contact order from the previous attack. Later that month, both the mother and the same father were arrested after law enforcement was called to the home

on suspicion of domestic abuse; police located one of the fathers in the basement, as HHS suspected. When HHS and providers tried to discuss the domestic-violence issues with the mother, she "was generally dismissive of it and did not understand how it could [a]ffect the children or how it could have an impact on them." In other words, "she did not think [domestic violence in the home] was a concern." The HHS worker opined that returning the children to the mother's custody would have been dangerous, as the mother could not protect herself, let alone the children. Eventually, the same father abused the mother so severely that she had to be life-flighted to a Des Moines hospital for multiple days to treat her injuries. The abuser was arrested and remained incarcerated through the time of the termination trial.

In addition to concerns about domestic violence, the mother's substance-abuse history is significant. The mother tested positive for methamphetamine on at least six dates between March 2022 and March 2023. She admitted to smoking marijuana and tested positive for that substance in January 2023. She also tested positive for amphetamines in March 2022 and January 2023. And she missed "numerous" drug-testing appointments. Despite this well-documented history of substance abuse, the mother did not successfully complete any treatment regimen to the degree that she can stay clean and sober. Multiple substance-abuse evaluators (including the most recent) recommended inpatient treatment, and the mother has yet to engage in such a program.

Both related to and independent of her drug use, the mother also has significant mental-health problems. Her diagnoses include post-traumatic stress disorder, dissociative identity disorder, obsessive compulsive disorder, and a mild

intellectual disability. The mother reports having an alternate "bad personality" named "Ms. Nitro" who is "aggressive." Again, despite this well-documented history, the mother's attendance at therapy has been inconsistent at best. She similarly resisted attending the Iowa Domestic Abuse Program (formerly known as the Batterers Education Program), which was required by terms of her probation.

The mother struggled, up to the time of termination, with basic parenting tasks. She was unable to handle scheduling or transporting children to appointments, even after providers "went to extraordinary lengths to help her organize her life," such as by creating and writing in a calendar for her. When the mother had supervised visits with the children, she sometimes failed to engage with them and needed significant redirection from providers. She repeatedly attempted to provide the youngest child with cereal that led to severe vomiting, even though a pediatrician and court proceedings directed her to stop feeding the cereal. One time, an HHS worker observed one of the preschool-age children with a "marijuana pipe" in his mouth and access to firecrackers, a lighter, and "something that either looked like a gun clip or like a novelty knife." To the extent the mother made any significant improvement working with providers on parenting skills during the life of these cases, there was "back-sliding" soon after her "sporadic" improvements. The mother never progressed beyond supervised visits, and even those had issues as recently as the month of the termination trial.

The mother also engaged in "triangulation" and "manipulation" with regard to the HHS caseworkers and their supervisors, ultimately leading to changes in personnel working the case. A caseworker also described attempts to interfere with drug-testing, including the mother's claim that one patch "had fallen off" and

the mother's admission that she took off another "because she was upset." On another occasion, the mother claimed to be unable to urinate on her testing date. On still other occasions, she refused to let workers into the house for home assessments. During the termination trial, the mother declared she was going to "put [the HHS caseworkers] on blast" for allegedly lying about all manner of things.

In June 2022, all of the parents involved in the case, including the mother, were granted six-month extensions to work toward reunification. Nearly all of the issues discussed in this opinion persisted past that extension.

The juvenile court accurately, although bluntly, summarized the record evidence concerning the mother's willingness to rehabilitate and work toward reunification:

> It is apparent that the mother only does what she wants to do and only when she wants to do it. She resists requests from providers and frequently rebuffs attempts by providers to help her. She believes that she knows better than everyone else. [The mother] did not heed multiple recommendations to engage in inpatient substance abuse treatment, simply because she did not want to. Earlier in the case, she put cereal in her baby's bottle even after she was repeatedly told that it caused him to vomit profusely afterwards. [The mother]'s stubbornness has been the main obstacle to reunification. The mother spent the vast majority of the case thinking she was too good and too cool to meaningfully engage in services.

These observations track those of three different HHS workers, who opined that the mother "feigned ignorance so we would not be able to help her," "didn't like to hear feedback from other people," "believed she knew how to parent and her way of parenting was the right way," and "believes what she believes and I can't tell her otherwise." Those observations are in turn consistent with the mother's failure to complete any mental-health, substance-abuse, or parenting-skills programs.

The mother's unwillingness to use services also carried over to the children. The mother told HHS that "she doesn't believe in therapy and [the children] don't need services." She denied permission for one of the children to receive necessary speech therapy through an area education agency, as the mother does not believe the child needs those services despite a completed assessment to the contrary. And she refused to consent to the school's recommendation for another child to be placed on an Individualized Education Plan because she believes "[the child] don't need it."

Both HHS and the children's guardian ad litem recommended termination of parental rights. The juvenile court terminated the mother's rights to all three children, and this appeal follows.

## II. Standard of Review

"We review termination proceedings de novo." *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). "The primary interest in termination proceedings is the best interests of the child." *Id.*

## III. Discussion

The mother makes four arguments on appeal: (1) she urges she should have received another six-month extension to work toward permanency; (2) she challenges whether termination is in the best interests of the children; (3) she claims the permissive bond exception precludes termination; and (4) she alleges HHS failed to make reasonable efforts in the services she was provided. We reject each of these claims for the reasons that follow.

### A. Another Six-Month Extension

"[T]he juvenile court may deny termination and give the parent an additional six-months for reunification *only if* the need for removal 'will no longer exist at the end of the additional six-month period.'" *In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) (emphasis added) (quoting Iowa Code § 232.104(2)(b) (2021)).

As the State correctly points out, the mother received a six-month extension in the summer of 2022 and did not use that time to meaningfully address her underlying problems. In looking at the totality of the record, nothing convinces us the need for removal would no longer exist after another six-month extension. Before and after receiving the extension, the mother continued to test positive for controlled substances and, as of termination, she failed to make significant progress in substance-abuse or mental-health treatment. At the termination trial, an HHS worker testified that she did not believe it likely the children could return to the mother's custody in six months. The mother's treating therapist offered a similar view when questioned by HHS. And perhaps most telling, when the record was left open at the end of the second day of the termination trial for the mother to submit results from new drug tests, the test came back positive for both methamphetamine and amphetamine—after the mother testified under oath that the test would come back clean.

The juvenile court denied the request for more time, reasoning that the mother was "no closer to reunification than she was on the date of the removal. Indeed, she may be further away." We agree.

## B. Best Interests of the Children

"We have long recognized that an unresolved, severe, and chronic drug addiction can render a parent unfit to raise children." *In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012). All of those descriptors—unresolved, severe, and chronic—apply to the mother here. We also give weight to the "numerous" missed drug-testing appointments. "Under our case law, we presume that the numerous missed drug tests would have been positive for illegal substances." *In re C.G.*, No. 22-1948, 2023 WL 1809988, at *2 (Iowa Ct. App. Feb. 8, 2023) (citing *In re R.A.*, No. 21-0746, 2021 WL 4891011, at *1 (Iowa Ct. App. Oct. 20, 2021) (collecting cases)). We consider this evidence in light of the children's safety, the best placement for their long-term nurturing and growth, and their physical, mental, and emotional needs. Iowa Code § 232.116(2) (2023).

On our de novo review, we agree with the juvenile court that termination is in the best interests of the children. The children are well cared for by their foster parents in a home that is safe, clean, and loving. The children's needs cannot be met by the mother, and they deserve permanency—particularly after being out of the mother's custody for some twenty-one months at the time of termination.

## C. Permissive Bond Exception

"The court may exercise its discretion in deciding whether to apply the factors in section 232.116(3) to save the parent-child relationship based on the unique circumstances of each case and the best interests of the children." *In re A.R.*, 932 N.W.2d 588, 591 (Iowa Ct. App. 2019). Here, the juvenile court said it well: "[The children] undoubtedly will be sad if they stop seeing [the mother], but the long-term benefits of permanency and living in a stable home far outweigh

those concerns." A parent resisting termination has the burden to prove this permissive exception by clear and convincing evidence, and our case law recognizes that neither a parent's love nor the mere existence of a bond are enough to prevent termination. *See In re A.B.*, 956 N.W.2d 162, 169–70 (Iowa 2021); *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). Assuming without deciding that the mother adequately preserved this issue, whatever bond may exist between the mother and children does not outweigh the need to provide the children with a permanent, safe, and stable home. The mother's history convinces us she cannot provide such a home now or at any time in the immediate future. We, like the juvenile court, decline to apply this permissive exception.

### D. Reasonable Efforts

Last, the mother contests whether HHS made reasonable efforts toward reunification. "[W]hat constitutes reasonable services varies based upon the requirements of each individual case." *In re C.H.*, 652 N.W.2d 144, 147 (Iowa 2002).

The parent must "object to services early in the process so appropriate changes can be made." *C.B.*, 611 N.W.2d at 493–94. "In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding." *C.H.*, 652 N.W.2d at 148. During the CINA phase, the mother requested—and the juvenile court granted— additional drug testing. Otherwise, the permanency orders show the court consistently found the State provided reasonable efforts toward reunification and "[n]o party has requested additional services or assistance." Because the mother

did not timely challenge the adequacy of the services offered, she waived any challenge to those services on appeal. *See C.H.*, 652 N.W.2d at 148.

Nevertheless, the mother briefly challenged the services offered in a filing after conclusion of the termination trial. Even if this were sufficient to preserve the issue for appeal, we would again agree with the juvenile court's blunt but accurate assessment of the record evidence:

> The evidence shows that [HHS] and its social workers bent over backwards to help accommodate the mother. They met with her frequently to review the expectations, they combined appointments to help her accomplish multiple tasks at the same time, they offered solution focused meetings (which she declined), and they helped her maintain a calendar with her obligations on it. Even with all of this assistance and handholding, the mother could not meet expectations.
> The Court believes that [the mother's] inability to meet expectations was caused primarily by her stubbornness and not her lack of intellectual ability. The mother failed to complete her assignments because she thought they were stupid and a waste of her time, not because she did not understand them.
> The Court also notes that [HHS] did not ask the mother to build a rocket from scratch or complete another Herculean task. The social workers simply asked her to go to substance abuse treatment, attend mental health treatment, and work on becoming a better mother. Parenting three children is much more complex and exhausting than anything [HHS] asked her to do.

We also note the record includes examples of efforts by HHS to condense or combine services, in an attempt to better serve the mother. The mother's reasonable-efforts argument provides no basis for relief.

## IV.    Disposition

Having rejected the mother's contentions on appeal, we affirm the termination of parental rights.

**AFFIRMED.**